IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **JESUS L. GOVEA** | § | **CIVIL ACTION NO. 2:22-cv-01328** |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **CB&I, LLC and MCDERMOTT** | § | |
| **INTERNATIONAL, LTD.** | § | |
| *Defendants* | § | |
| | § | **JURY DEMAND HEREIN** |

## PLAINTIFF'S ORIGINAL COMPLAINT

**NOW COMES** Plaintiff, **JESUS L. GOVEA,** through undersigned counsel, who files his Original Complaint against Defendants, **CB&I, LLC** and **MCDERMOTT INTERNATIONAL, LTD.** Plaintiff hereby states as follows:

## JURISDICTION AND VENUE

1. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964 as it appears at 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981.

2. This Court has jurisdiction pursuant to the following statutes:

    a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, law or treaties of the United States;

    b. 28 U.S.C. § 1343 (3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government;

3. Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission on or about August 30, 2016 (Charge No. 461-2016-01745).

1

4. The EEOC issued its "Notice of Right to Sue (Conciliation Failure)" on February 28, 2022. *See* Exhibit A. Plaintiff is afforded 90 days from his receipt of such Notice to commence suit, and the date of this filing is within the statutory period.

5. Venue is appropriate in this judicial district under 28 U.S.C. § 1391 (b) because the events that gave rise to this Complaint occurred in the Western District of Louisiana, specifically in Calcasieu Parish, making the Lake Charles Division the most appropriate Division for this suit.

## PARTIES

6. Plaintiff is a citizen of the United States and resides in the City of Orange, State of Texas.

7. Plaintiff is Hispanic and, as such, is a member of a protected class.

8. At certain times relevant to this suit, Plaintiff worked as a Journeyman Rigger for CB&I, LLC at its location in Hackberry, Louisiana.

9. Defendant, **CB&I, LLC** ("CB&I"), is a municipal limited liability company licensed to conduct and conducting business in the State of Louisiana. The acts complained of in this Complaint occurred in Calcasieu Parish, State of Louisiana, where CB&I performs a significant amount of business. At all times relevant to Plaintiff's employment, CB&I was Plaintiff's acting employer. Upon information and belief, MCDERMOTT INTERNATIONAL, LTD. has acquired CB&I in recent acquisition proceedings, and therefore acquired and bears responsibility for all CB&I legal liabilities.

10. Defendant, **MCDERMOTT INTERNATIONAL, LTD.** ("MCDERMOTT"), is a municipal corporation licensed to conduct and conducting business in the State of Louisiana. The acts complained of in Plaintiff's Complaint occurred in Cameron Parish,

2

State of Louisiana, where McDermott performs a significant amount of business. As set forth in Paragraph 9, upon information and belief, MCDERMOTT has assumed and therefore bears responsibility for any and all CB&I legal liabilities.

## FACTUAL ALLEGATIONS

11. Plaintiff began his employment with Defendant CB&I as a Journeyman Rigger at its facility located in Hackberry, Louisiana in approximately April 2016.

12. Plaintiff was assigned to a crew situated in CB&I's Area 411 "laydown yard," which later became known as Train 3. Plaintiff's crew consisted of himself, along with four (4) other members: 1) Elliot Williams (African-American, Rigger); 2) Kenneth Monroe (African-American, Rigger); 3) Jerry Vincent (Caucasian, Rigger); and 4) Lawrence Adams (Caucasian, Crane Operator).

13. Throughout his tenure, Plaintiff was exposed to the severe and utterly pervasive discriminatory behavior of another rigger on his crew, Jerry Vincent ("Vincent") (Caucasian).

14. Vincent racially profiled Plaintiff and other crew members on the basis of their protected characteristics: Hispanic and/or African-American.

15. Any time one of the other crew members would walk past Vincent, Vincent would make a racist comment, depending on which employee walked by.

16. If Plaintiff, who is Hispanic, walked into the area, Vincent made remarks to the effect of "go swim back across the river" and repeatedly and consistently referred to him as a "wetback." Additionally, Vincent repeatedly referred to Hispanics as "nasty" and

consistently uttered phrases to the effect of, "Mexicans only come here to take White Man's jobs."

17. Additionally, Vincent repeatedly asked Plaintiff racist questions, including, but not limited to, "did the Mexicans at the food camp leave any food for the brothers? You know they don't get food stamps there."

18. If it was either Kenneth Monroe ("Mr. Monroe") or Elliot Williams ("Mr. Williams"), Vincent would make jokes about "watermelons," "chicken," and other items readily associated derogatorily with African-Americans. He also made comments to the effect of, "I can't stand N******" or would refer to other employees as "those damn N******" in the direct presence of Plaintiff, Mr. Monroe, and Mr. Williams.

19. On several occasions, the crewmembers, including Plaintiff, told Vincent to stop and that, "enough is enough" with the incessant and derogatory commentary. In response, Vincent laughed and stated, "don't make me call Paul, because you know I will."

20. At the time, Paul Williams ("Williams") served as Foreman, and he and Vincent were very close friends. As such, Vincent, due to his close relationship with Williams, made Plaintiff and his crewmembers fear for their jobs should they "open their mouth."

21. Plaintiff immediately realized that CB&I was acquiescing in Vincent's behavior, as Vincent made these derogatory statements in morning safety meetings, in which several crews were present. The Foreman over Plaintiff and Vincent's crew, Paul Williams, bore direct witness to Vincent's pervasive comments and jokes; however, he simply laughed as though he was amused by them. In fact, not only did Williams laugh at Vincent's racist comments and jokes, but he oftentimes asked and encouraged Vincent to repeat them.

22. At no point in time did Paul Williams ever instruct Vincent that the behavior was offensive and entirely inappropriate. Although Paul Williams was African-American, he acted as though he enjoyed Vincent's racially demeaning jokes and verbal attacks on his fellow-employees.

23. In addition to Paul Williams, Site Superintendent, Sidney "Boo" Murray ("Murray") was also oftentimes present during Vincent's racial comments and jokes. Like Paul Williams, Murray also laughed at the racial utterances and made no effort whatsoever to curb or stop them from taking place.

24. In approximately July 2016, Paul Williams was promoted from Foreman to General Foreman. Consequently, James Dever ("Mr. Dever") (Caucasian) became the acting Foreman over Plaintiff's crew.

25. On or about July 19, 2016, Plaintiff approached Dever and verbally informed him of Vincent's pervasive racist commentary and jokes.

26. On July 21, 2016, Plaintiff approached Elliot Williams and asked him, "If I report this, will you back me up?" In response, Mr. Williams stated that he would confirm Plaintiff's concerns and the events giving rise thereto. At that point, Plaintiff and Mr. Williams decided to also involve Mr. Monroe, who, like Plaintiff and Mr. Williams, had repeatedly witnessed Vincent's pervasive racial harassment and Vincent's overt refusal to address the same. Because Mr. Monroe was not at work on July 21, 2016, Plaintiff and Mr. Williams decided that they would speak to CB&I supervision the following day.

27. During the morning meeting on July 21, 2016, Vincent made an exceptionally discriminatory remark about a Hispanic employee. While Plaintiff and Mr. Williams had wanted to wait until Mr. Monroe returned to the site to formally "report" the harassment to

CB&I management, Vincent's racial epithet was so egregiously inappropriate that Plaintiff and Mr. Williams decided to proceed with the report, even in Mr. Monroe's absence.

28. On or about July 21, 2016, Plaintiff and Mr. Williams approached their newly appointed Forman, Mr. Dever, at which time they relayed their concerns with the severe and pervasive discriminatory treatment Vincent had been exhibiting in the workplace.

29. Paul Williams had recently been promoted to General Foreman. As such, Plaintiff and Mr. Williams now had a new direct supervisor, Dever, to whom they felt much safer reporting.

30. After informing Mr. Dever about Vincent's conduct, Plaintiff and Mr. Williams stated, "you have to do something about this, please help us." In response, Mr. Dever stated that he would talk to Vincent and that Plaintiff and Mr. Williams could go back to work because he (Dever) "would handle it."

31. Plaintiff completed a written Witness Statement on July 21, 2016. Therein, Plaintiff explained the pervasive racist behavior exhibited by Vincent, that Paul Williams had repeatedly laughed at Vincent's jokes and made him "fear for [his] job if [he] opened [his] mouth." Several other employees, including Mr. Williams, Mr. Monroe, and Mr. Adams, submitted written statements confirming Vincent's rampant racist behavior.

32. Upon good information and belief, following Plaintiff's submission of a written statement to Dever, Murray called both Vincent and Paul Williams into the office and spoke to them on July 21, 2016.

33. On July 22, 2016, Mr. Dever sent Plaintiff, Mr. Williams, and Mr. Monroe to speak directly with Murray, as opposed to Human Resources. In response, Murray stated that he could "make this all go away" and "we don't need to take this any further" or go to Human Resources.

34. On approximately July 23, 2016, Plaintiff, Mr. Williams, and Mr. Monroe collectively approached the Human Resources office in order to report their concerns of a racially hostile work environment. Before they even reached the office door, Murray walked up and screamed, "[w]hy the hell are you up here? Thereafter, Murray reiterated to the employees that they could only come to HR if they had a supervisor with them.

35. After making the comment, Murray walked in and spoke to an HR representative for approximately 30 minutes. Thereafter, Plaintiff, Mr. Williams, and Mr. Monroe all made statements to HR about the harassment.

36. Upon good information and belief, HR representatives spoke to Paul Williams regarding the allegations against him – i.e., that he had been aware of Vincent's harassment, failed to report it or stop it and, in fact, condoned the same – on approximately July 25, 2016.

37. When Paul Williams learned that Plaintiff, Mr. Williams, and Mr. Monroe had reported him to Human Resources, he went out to the work area and told the crew that "HR didn't want to hear what you have to say" and that "HR told [me] to deal with it and [you]." Paul Williams then repeatedly asked the crew what they wrote in their statements, and they refused to answer him.

38. Almost immediately after he submitted his written statement to Dever, Plaintiff noticed a change in his work environment. For example, there existed a large stack of rebar that had been sitting in the same position on-site for quite some time. The next day, Williams came over and forced Plaintiff, Mr. Williams, and Mr. Monroe to move the entire stack of rebar without any explanation other than, "because I want it moved." Williams then began assigning Plaintiff, Mr. Williams and Mr. Monroe menial, degrading tasks, and he began

coming around the crew's worksite more frequently, would consistently glare at the crew and/or find some menial matter to yell about.

39. Shortly after Mr. Dever obtained Plaintiff's witness statement, Plaintiff, along with Mr. Williams and Mr. Monroe, were using a crane to load rebar on to a trailer for transport. Williams sent over a group of individuals, including Boo Murray, the Superintendent, to take pictures and video footage of the crew completing their task. Almost immediately after the group of spectators left, Plaintiff and his crew were called into the office, wherein an individual (a male with a strong Australian-sounding accent), stated that they were being written up for failing to use two taglines when loading the rebar.

40. Notably, Plaintiff and his crew followed proper protocol and had utilized two taglines as required; however, the picture shown to him did not indicate that the taglines had been used. As soon as the individual was noticed that the proper taglines had been used, the individual began apologizing for the miscommunication and mistake.

41. After the individual left, Boo Murray called Plaintiff, Mr. Williams, and Mr. Monroe into the office, separately, to discuss the perceived "incident." At this time, Murray informed Plaintiff that he was still intending to write Plaintiff up for "failing to use two taglines," despite the fact that he was shown direct proof that two taglines had been used. In response, Murray stated, "listen, I can make this all go away" and that "we don't need to take this any further or go to HR."

42. Effectively, Murray told Plaintiff that he would not write him up (for an incident that did not actually occur) so long as Plaintiff promised that he would not go to HR. Accordingly, Plaintiff was put on notice that, should he attempt to go to HR for any reason, that write-ups would result.

43. Thereafter, CB&I deliberately separated Plaintiff, Mr. Williams and Mr. Monroe so that none of them remained on the same crew.

44. For the next several months, and almost on a daily basis, Williams engaged in a series of "scare tactics," or conduct and actions intended to intimidate the crew and place them in imminent fear of termination in retaliation for reporting Vincent. For example, Williams would ride by and make statements to the effect of "you're absolute scum of the earth because you went to HR." He consistently stated, "I'm going to get your ass fired," "you're not gunna make it through this week," and you're still here? I'm going to get rid of you. He also made statements to the effect of, "it would be a shame if you get hurt out here" or "it would be a shame if you got killed in the man cap." These threats and comments persisted through Plaintiff's constructive discharge on or about August 15, 2016, as described in following paragraphs.

45. Plaintiff submitted a subsequent statement to Defendant, wherein he expressly indicated that "we have suffered from retaliation every (sic) since we went to HR at our worksite. We have been bullied, we have been stressed out beyond make and fear for our safety." Mr. Monroe also submitted a similar statement.

46. On August 3, 2016, counsel for Plaintiff contacted Defendant's Senior Counsel for Labor and Employment Law division, Margaret C. Phillips, regarding representation of Plaintiff, Mr. Williams, and Mr. Monroe. Counsel followed the conversation with an email to Ms. Phillips, with the subject line "Jesus Govea, Elliot Williams, Kenneth Monroe," at 2:46 p.m. on August 3, 2016. In an email response dated 3:36 p.m., Ms. Phillips referred the employees to the CB&I hotline and asked for any recordings taken by the aggrieved employees.

47. At some point thereafter in August 2016, Paul Williams approached Plaintiff and stated, "hey G let's talk." Thereafter, Williams instructed Plaintiff to "drop his complaint" and tell the other two employees (Elliot Williams and Kenneth Monroe) to do the same. In response, Plaintiff stated, "I can't do that, Paul." In response, Williams stated, "it would be a shame if you got hurt out here," and when Plaintiff asked Williams what he meant by that statement, Williams became aggressive and physically threatened Plaintiff. At that point, Williams told Plaintiff that he would "beat [his] a ** if [he] went to HR." A civil worker in the area overheard the exchange, immediately approached the scene, and told Williams to walk away before it escalated to physical violence.

48. Within mere hours later, a Caucasian General Foreman approached Plaintiff and asked him "what it would take" to convince Plaintiff, Mr. Williams, and Mr. Monroe to "drop the legal action" against Defendant. The individual further stated that he could make Plaintiff's life "real easy" if Plaintiff "helped him and the company out." The individual further stated that, if Plaintiff continued with litigation, it would be very hard for Plaintiff to find other work in the industry. Plaintiff does not recall the individual's name; however, Plaintiff knew the individual was a General Foreman due to the fact that he had the requisite stripes on his hard hat.

49. As a result of the "scare tactics" employed by Williams, and when combined with the statements made by the Caucasian General Foreman, Plaintiff became concerned that CB&I personnel had placed him under a microscope so that they could fire him the very second he made any mistake, no matter how minor.

50. The General Foreman's statement regarding Plaintiff's attorney and legal action, combined with the pervasive retaliatory behavior exhibited by Williams, ultimately caused Plaintiff

to resign in August 2016, in the form of a constructive discharge, as Plaintiff could no longer perform his duties to the severe and pervasive hostile work environment to which he had been subjected.

51. While Plaintiff needed the job to maintain financial stability, the environment had become so hostile and intolerable that Plaintiff could no longer perform the functions of his job under those conditions.

52. Within less than one week after Williams physically threatened Plaintiff to "drop his complaint" and being told by the Caucasian General Foreman that he should "help him and the company," Plaintiff tendered a letter of resignation to Defendant via email on August 15, 2016. In the letter attached to Plaintiff's email, Plaintiff explained, among other things, that he "could no longer work under the current stressors [he was] being put under by CB&I" and that he could "no longer tolerate the emotional abuse [he was] being put through retaliation by those 'over' [him]."

53. Plaintiff was forced to resign from his employment due to intolerable working conditions and, thus, was constructively discharged, on approximately August 15, 2016.

---

**FIRST CAUSE OF ACTION:**
**RACIAL DISCRIMINATION (HOSTILE WORK ENVIRONMENT) IN EMPLOYMENT**
*Pursuant to 42 U.S.C. 2000e et seq.*

54. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

55. Under Title VII, it is an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C.S. § 2000e-2(a)(1).

56. Defendant is an "employer" subject to the provisions of Title VII. At all relevant times, CB&I was an entity engaged in an industry affecting commerce who had fifteen or more employees during at least twenty (20) calendar weeks in both 2015 and/or 2016.

57. Plaintiff is Hispanic and is therefore a member of a protected class.

58. Plaintiff was qualified for his position as a Journeyman Rigger. Not only did Defendant specifically hire Plaintiff for the position, but Plaintiff was able to perform all functions of his job satisfactorily.

59. Plaintiff was denied equal promotional opportunities to that of non-Hispanic and non-African-American employees. As such, Plaintiff suffered an adverse employment action for purposes of establishing a Title VII claim.

60. Plaintiff was subjected to severe and/or pervasive harassment on the basis of his race/national origin from April 2017 through, at least, late July 2017. As such, Plaintiff has suffered an adverse employment action for purposes of establishing a Title VII claim. Plaintiff further submits that the pervasive harassment significantly contributed to his forced resignation, or constructive discharge, on August 15, 2016.

61. Plaintiff was subjected to unlawful discrimination on the basis of his race/national origin. As set forth in the preceding paragraphs, Plaintiff, Mr. Williams and Mr. Monroe witnessed Vincent racially profile them on the basis of their race and make disparaging comments on an almost daily and recurrent basis. Plaintiff could not walk into his work area without Vincent making some racially charged, derogatory comment.

62. The harassment Plaintiff suffered was based on his race/national origin. The alleged harassment dealt specifically with Plaintiff's status as a Hispanic, including, but not limited to constant, daily remarks to the effect of: 1) "go swim back across the river"; 2) a

"wetback"; 3) references to Hispanics as "nasty" and that "Mexicans only come here to take White Man's jobs;" 4) "did the Mexicans at the food camp leave any food for the brothers? You know they don't get food stamps there." Vincent also repeatedly employed racial slurs and jokes against African-American crewmembers in Plaintiff's immediate presence.

63. Vincent subjected Plaintiff, Mr. Williams and Mr. Monroe to severe and pervasive ridicule, insult, and mental distress by his repeated use of racial profiling and racial epithets in the workplace.

64. Vincent's conduct was subjectively offensive to Plaintiff, and, as made apparent by the other witness statements, was objectively offensive to other employees.

65. In fact, a Caucasian employee wrote a statement verifying the hostile work environment to which Plaintiff and his fellow co-workers had been subjected by Vincent.

66. CB&I, through its agents and employees, were well aware of Vincent's discriminatory conduct long before any purported remedial action was taken. Vincent made these pervasive, continuous racial slurs and epithets during morning meetings, at which Williams, the Foreman (later General Foreman), and oftentimes Boo Murray, the Site Superintendent, were present. Notably, rather than addressing Vincent and telling him to stop immediately, Williams would oftentimes laugh and ask Vincent to repeat his comment because he thought it was funny. Boo Murray simply laughed or otherwise acquiesced in the discriminatory ridicule.

67. Plaintiff's race and/or national origin, Hispanic, was a determining and motivating factor in treating Plaintiff less favorably than Caucasian employees.

68. Defendant failed to act in accordance with 42 U.S.C. § 2000e.

69. Defendant's discrimination is willful, intentional, and committed with malice or reckless indifference to the protected rights of Plaintiff.

70. As a result of Defendant's discriminatory conduct, Plaintiff has suffered non-pecuniary losses including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses to be more fully developed at the trial on this matter.

71. Wherefore Plaintiff asks this Honorable Court to find **CB&I, LLC** liable for the violation of Title VII of the Civil Rights Act of 1964.

### SECOND CAUSE OF ACTION: RETALIATION
*Pursuant to 42 U.S.C. § 2000e-3(a)*

72. Plaintiff incorporates and reinstates each of the above paragraphs as if fully set forth herein.

73. Title VII makes it an unlawful employment practice for a person covered by the Act to discriminate against an individual "because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

74. Plaintiff advised Defendant, through several supervisory and Human Resources personnel, of what he reasonably believed to constitute illegal discriminatory activity exhibited by its agents and/or employees on numerous occasions. Furthermore, after retaining an attorney, Plaintiff, through counsel, contacted Senior Legal counsel for Defendant on August 3, 2016 to, again, reiterate concerns of the hostile work environment, both in the racial and retaliatory sense.

75. Plaintiff's opposition to what he perceived to be workplace discrimination on the basis of race constitutes protected activity pursuant to Title VII.

76. Immediately following Plaintiff's reports to Dever and, subsequently, to Human Resources, Defendant, through its agents, supervisors and/or employees, in a continuing course of conduct, subjected Plaintiff to retaliation and discrimination in the terms, conditions, and privileges of his employment in retaliation for him opposing what he believed to be unlawful conduct on various occasions. As an illustrative example, not only did Boo Murray attempt to write Plaintiff up after confirming that no violation occurred unless he agreed not to go to HR, Paul Williams, General Foreman, physically threatened Plaintiff with violence if he did not "drop his complain," and another General Foreman approached Plaintiff and effectively informed Plaintiff that, if he did not drop his complaint, he would have a very difficult time finding another job in the industry.

77. Within less than one (1) month after Plaintiff first approached Dever, Plaintiff was constructively discharged due to the rampant efforts of Paul Williams and other supervisory employees to target Plaintiff, threaten Plaintiff, and otherwise attempt to scare Plaintiff into dropping his well-founded complaints against Defendant.

78. Defendant failed to act in accordance with 42 U.S.C. § 2000e-3(a).

79. Defendant's retaliation is willful, intentional, and committed with malice or reckless indifference to the protected rights of Plaintiff.

80. As a result of Defendant's discriminatory conduct, Plaintiff has suffered non-pecuniary losses including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses to be more fully developed at the trial on this matter.

81. Wherefore Plaintiff asks this Honorable Court to find Defendant, **CB&I, LLC,** liable for the violation of 42 U.S.C. § 2000e-3(a).

## THIRD CAUSE OF ACTION:
### Violation of 42 U.S.C. § 1981

82. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

83. 42 U.S.C. § 1981 protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts without respect to race. 42 U.S.C. § 1981(a). The statute currently defines "make and enforce contracts" to include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship. 42 U.S.C. § 1981(b). 42 U.S.C. § 1981 ensures that all persons have the same right to make and enforce contracts, including the making, performance, modification, and termination of employment contracts.

84. Plaintiff incorporates the contents of Paragraphs 1-83 by reference, as Title VII and § 1981 claims are analyzed under the same evidentiary standards.

85. Wherefore, Plaintiff asks this Honorable Court to find that, under 42 U.S.C. § 1981, Defendant **CB&I, LLC,** liable for the violation of 42 U.S.C. § 1981.

## PRAYER

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendant providing the following relief:

(a) All damages to which Plaintiff may be entitled, including but not limited to back pay, reimbursement for lost position and training, social security and other benefits, front pay, and any and all statutory relief;

(b) Reasonable attorney's fees, with conditional awards in the event of appeal;

(c) Pre-judgment interest at the highest rate permitted by law;

(d) Post-judgment interest from the judgment until paid at the highest rate permitted by law;

(e) Costs, including expert fees;

(f) Reasonable and necessary medical care and expenses in the past and future;

(g) Mental anguish damages in the past and future;

(h) Punitive or exemplary damages;

(i) Injunctive relief; and

(j) Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

---

## DEMAND FOR JURY TRIAL
---

Pursuant to Rule 38 of Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

**Respectfully Submitted**,

**SUDDUTH & ASSOCIATES, LLC**
1109 Pithon St.
Lake Charles, Louisiana 70601
Tel: (337) 480-0101
Fax: (337) 419-0507

BY: */s/ James E. Sudduth, III*
**JAMES E. SUDDUTH, III, #35340**
**KOURTNEY L. KECH, #37745**
**PIERCE A. RAPIN, #38579**
*Counsel for Plaintiff*